[918 NYS2d 57]

XL SPECIALTY INSURANCE Co. et al., Appellants, v LORAL SPACE & COMMUNICATIONS, INC., Respondent.

First Department, February 17, 2011

APPEARANCES OF COUNSEL

*Boundas, Skarzynski, Walsh & Black, LLC*, New York City (*James Sandnes, James A. Skarzynski, Rachel Simon* and *Chelsea J. Walsh* of counsel), for appellants.

*Kirkland & Ellis LLP*, New York City (*Eric F. Leon, Jay P. Lefkowitz* and *Maura M. Klugman* of counsel) and *Trachtenberg Rodes & Friedberg LLP*, New York City (*Leonard A. Rodes* of counsel), for respondent.

### OPINION OF THE COURT

MOSKOWITZ, J.

The question this Court needs to resolve is whether plaintiff insurers' policy covers fees defendant insured must pay to counsel for the plaintiffs in two lawsuits. Our analysis centers primarily around whether these fees constitute (1) a "Loss" and (2) a "Securities Claim" under the policy. According to our interpretation, the motion court was correct to declare that there is coverage for the fees of plaintiffs' counsel in the derivative lawsuit. However, the motion court was incorrect to the extent it declared that plaintiff insurers must cover fees to counsel in the class action, because that case did not involve a "Securities Claim."

Plaintiffs-appellants XL Specialty Insurance Co., Arch Insurance Company and U.S. Specialty Insurance Company (the insurers) issued a "Management Liability and Company Reimbursement" policy to defendant-respondent Loral Space & Communications, Inc. (Loral) on a claims-made basis. The parties agree that section I (C) of the policy is the applicable provision. Under this section, the insurers agreed to pay, "on behalf of the Company Loss resulting solely from any Securities Claim first made against the Company during the Policy Period . . . for a Company Wrongful Act." The policy defines "Loss" as: "damages, judgments, settlements or other amounts (including punitive or exemplary damages where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay." "Company Wrongful Act" means: "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company in connection with a Securities Claim."

Loral paid an additional premium to amend the policy's definition of "Securities Claim" to include shareholder derivative claims in endorsement no. 11:

> " 'Securities Claim' means a Claim, other than an administrative or regulatory proceeding against or investigation of a Company, made against any insured:
>
> "(1) for a violation of any federal, state, local regulation, statute or rule regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities which is:
>
> "(a) brought by any person or entity based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the purchase or sale of, or offer to purchase or sell, securities of the Company; or
>
> "(b) brought by a security holder of a Company with respect to such security holder's interest in securities of such Company; or
>
> "(2) brought derivatively on behalf of the Company by a security holder of such Company."

Thus, the policy covers either a derivative claim by a shareholder or a claim made against the company "for a violation of any federal, state, local regulation, statute or rule regulating securities."

During the policy period, Loral entered into a transaction with a controlling shareholder, MHR Fund Management LLC (MHR), by which MHR agreed to provide Loral with $300 million. In exchange, Loral agreed to issue preferred stock to MHR that was convertible into common stock.

Other shareholders caught wind of Loral's transaction with MHR and ultimately shareholders filed two lawsuits in the Delaware Chancery Court. The first was a shareholder derivative action, by BlackRock Corporate High Yield Fund, Inc., that sought rescission of the transaction (the BlackRock derivative suit). The second was a class action by another shareholder, Highland Crusader Offshore Partners, L.P. (the Highland class action), seeking damages. Both suits alleged that Loral's board of directors breached its fiduciary duties in approving the transaction because the MHR financing was not entirely fair to Loral. In large part this was because: (1) the special committee of

directors established to negotiate the MHR financing was not independent from MHR; (2) the process leading to the execution of the MHR financing was otherwise unfair to Loral; and (3) the total value of the preferred stock that Loral issued to MHR was worth far more than the $300 million that Loral received in the MHR financing.

Loral stood by its directors and defended against both lawsuits.

The Delaware Chancery Court consolidated the two actions and tried them together. After trial, the Delaware Chancery Court, looking at the "entire fairness"[1] of the transaction, held that the transaction was unfair to Loral because, inter alia, the dividend rate was too high and the conversion rate was too low (*see In re Loral Space & Communications Inc.*, 2008 WL 4293781, 2008 Del Ch LEXIS 136 [2008]). To remedy this unfairness, the Delaware Chancery Court reformed the terms of the MHR financing. Most significantly, the Delaware Chancery Court restructured the MHR financing to provide that, in return for its $300 million investment in Loral, MHR would receive nonvoting common stock instead of convertible preferred stock. At no point did the Delaware Chancery Court order MHR, Loral or anyone else to pay any money damages to Loral or the underlying plaintiff shareholders. The Delaware Chancery Court found it unnecessary to "undertake at this time a director-by-director liability assessment" (2008 WL 4293781, *33, 2008 Del Ch LEXIS 136, *120) because MHR and Loral could work out a remedy without awarding Loral any monetary damages. Thus, the Delaware Chancery Court did not make any findings one way or the other concerning the fault of Loral's officers and directors.

Thereafter, counsel for BlackRock and counsel for Highland applied for awards of attorneys' fees. Loral stipulated to an award of almost $8.8 million for BlackRock's counsel in the derivative action. Using the lodestar method, the Chancery Court awarded Highland's counsel about $10.7 million for fees and expenses, finding that, although there had not been a creation of

---

1. Under Delaware law, a controlling or dominating shareholder standing on both sides of a transaction bears the burden of proving its entire fairness:

> "The concept of fairness has two basic aspects: fair dealing and fair price . . . However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness" (*Weinberger v UOP, Inc.*, 457 A2d 701, 711 [Del 1983]).

a common fund, the litigation had produced a substantial benefit to the company, thus warranting an award of fees under the "corporate benefit doctrine."[2] On appeal, the Delaware Supreme Court affirmed that award (*Loral Space & Communications, Inc. v Highland Crusader Offshore Partners, L.P.*, 977 A2d 867, 870 [Del 2009]).

Thereafter, Loral sought coverage for these fees from its insurers. Plaintiff insurers commenced this action seeking a declaration that they are not obligated to provide coverage to Loral for the attorneys' fees. The insurers argue primarily that Loral has not suffered a covered loss because the Delaware Chancery Court found no liability against Loral and only ordered a remedy against MHR (i.e., a restructuring of the transaction to dilute MHR's stocks to remove their voting rights). As the resulting restructure actually provided a benefit, albeit nonmonetary, to Loral, the insurers argue that Loral has not suffered a loss. The fees, the insurers extrapolate, simply reduce the benefit that Loral received.

■ Giving the unambiguous provisions of the policy "their plain and ordinary meaning" (*Nautilus Ins. Co. v Matthew David Events, Ltd.*, 69 AD3d 457, 459 [2010] [internal quotation marks and citations omitted]), the fee awards constitute a "Loss" resulting solely from a "Securities Claim" for a "Company Wrongful Act." The policy's definition of "Loss" is broad. It covers "other amounts" the insured becomes "legally obligated" to pay. Although the Delaware Chancery Court did not create a common fund, the shareholders' counsel can still seek fees from the corporation under the "corporate benefit doctrine." Thus, Loral is legally obligated to pay the amount of the fee award out of its own pocket. This situation fits squarely within the definition of "Loss" as an "other amount" Loral is "legally obligated to pay" (*see Safeway Stores, Inc. v National*

---

**2.** The "corporate benefit doctrine" allows the Delaware court to award attorneys' fees to plaintiffs' counsel in successful derivative or class action suits where there has been a benefit to the corporation. If shareholder litigation results in a money judgment benefitting the corporation or an ascertainable class, plaintiffs' counsel is ordinarily entitled to an allowance of fees paid from the "common fund" that counsel's efforts helped to create (*see Tandycrafts, Inc. v Initio Partners*, 562 A2d 1162, 1166-1167 [Del 1989]). When there is no common fund, but the corporation nevertheless receives a benefit, shareholders' counsel can still seek fees from the corporation, but will receive payment on a quantum meruit basis out of the corporation's own assets (*Tandycrafts* at 1167; *see also In re First Interstate Bancorp Consol. Shareholder Litig.*, 756 A2d 353, 361 [Del Ch Ct 1999], *affd sub nom. First Interstate Bancorp v Williamson*, 755 A2d 388 [Del 2000]).

*Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F3d 1282, 1287 [9th Cir 1995] [plaintiff's attorneys' fees that were part of settlement were "actual out-of-pocket loss" under insurance policy because "(t)he lawyers got the money, not the shareholders" even though shareholders received a dividend that was not a loss under the policy]). What the insurers are in essence suggesting is that the attorneys' fees should be offset against the value of the nonmonetary benefit Loral and its shareholders received as a result of the restructured transaction. But nothing in the policy suggests offsetting a loss by the amount of any nonmonetary benefits received.

I do not agree with the dissent's reading that "legally obligated to pay" refers to "the Retention." Nor would I equate "other amounts" entirely with "damages." The policy definition of "Loss" lists both "damages" and "other amounts . . . the insured is legally obligated to pay." If both items mean "damages," there would be no need to list "other amounts." Nevertheless, the attorneys' fees Loral had to pay constitute damages (*see UnitedHealth Group Inc. v Hiscox Dedicated Corporate Member Ltd.*, 2010 WL 550991, *10-11, 2010 US Dist LEXIS 10983, *29-31 [D Minn, Feb. 9, 2010] [portion of settlement constituting plaintiff's attorneys' fee award "falls squarely within the Policy's definition of '(d)amages' " where policy defined "(d)amages" as "any monetary amount . . . which an Insured is legally obligated to pay"]).

The argument that Loral received a benefit is illusory. As a result of the shareholder derivative suit, the Delaware court simply reformed the transaction to make it fair to Loral and its shareholders. Loral did not make a profit. There was nothing extra added as a result of the underlying action. At best, the reformation of the transaction leveled the playing field and repaired the wrong that Loral would have suffered otherwise. The Delaware court recognized this circumstance when it stated that the remedy would rectify the harm to Loral: "[T]he remedy rectifies the harm to Loral and its public stockholders from an unfair, non-market tested transaction that saddled the corporation with an unwieldy capital structure and a future in which MHR held unilateral veto power over virtually any major decision the Loral board made" (2008 WL 4293781, *32, 2008 Del Ch LEXIS 136, *119-120).

Finally, the "corporate benefit doctrine" was only the vehicle by which plaintiffs' counsel could receive compensation for the success in the derivative suit (*see In re First Interstate Bancorp*

*Consol. Shareholder Litig.*, 756 A2d at 360). While Loral may have received a benefit in that it no longer had to suffer harm, it does not follow that Loral actually made a tangible profit.

*Reliance Group Holdings v National Union Fire Ins. Co. of Pittsburgh, Pa.* (188 AD2d 47 [1993], *lv dismissed in part, denied in part* 82 NY2d 704 [1993]) does not help the insurers. In that case, the insured had acquired profits wrongfully. The decision merely stands for the well-established principle that there is no insurance where an insured is forced to disgorge funds that it acquired wrongfully (*id.* at 55; *see also Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528, 529 [2004]). Moreover, *Reliance* is distinguishable on its facts. After paying to settle various lawsuits, Reliance gained access to the remainder of the money it had acquired. Here, there is no remainder. As a practical matter, at the end of the underlying suit, Loral had the same $300 million that MHR invested in exchange for stock that Loral had before the start of the case. The only difference is now the stock that Loral issued is actually worth the $300 million.

█ In an ordinary derivative suit there is often a monetary settlement. The attorneys' fees traditionally come out of those settlement funds. In cases where the corporate defendant has insurance, the policy often helps fund the settlement. Loral paid an extra premium to obtain coverage for derivative lawsuits. Had the Delaware court instead rendered a monetary judgment against Loral in favor of minority shareholders, the insurers would be unlikely to contest coverage. But, that did not happen. Instead, in the face of this unusual transaction,[3] the Delaware Chancery Court crafted a creative, equitable remedy that retained the transaction's general parameters, but rendered it fair to all concerned and avoided even more litigation over whether certain individual director defendants should be liable. As part of this equitable judgment, the Delaware court also rendered a money judgment against Loral for the derivative plaintiffs' attorneys' fees. That Loral must now pay this amount places the fees squarely in the "other amounts" portion of the definition of "Loss."

Moreover, this policy covers derivative lawsuits. After all, the policy covers a "Securities Claim" "brought derivatively on behalf of the Company by a security holder of such Company."

---

**3.** The Delaware Chancery Court described the Loral-MHR transaction as "a large, non-market tested transaction, which is without many, if any, precedents" (2008 WL 4293781, *31, 2008 Del Ch LEXIS 136, *115).

As we noted, Loral apparently paid an additional premium to add derivative suits to the definition of "Securities Claim." The award of attorneys' fees is typical in a derivative suit where plaintiff has prevailed. To declare that Loral has no coverage for derivative plaintiffs' attorneys' fees would deprive Loral of the coverage for derivative lawsuits that it paid for and expected to receive. Had the insurers meant to exclude derivative plaintiffs' attorneys' fees, they could have limited the definition of "Loss," limited the definition of "Securities Claim" or drafted an exclusion.

■ Finally, the insurers argue that Loral cannot recover costs of, in effect, prosecuting a derivative action, and that Loral can only recover for these fees if the Delaware court *found* that Loral committed a "Company Wrongful Act." However, the policy does not contain these limitations. Rather, the policy covers all losses "resulting solely from any Securities Claim [the definition of which includes a derivative lawsuit] first made against the Company during the Policy Period . . . for a Company Wrongful Act." The definition for "Company Wrongful Act" includes an "*alleged* act" (emphasis added). Thus, the policy covers all losses resulting from a derivative action *alleging* a "Company Wrongful Act." The policy says nothing that requires a court to find that the company had committed a "Company Wrongful Act" before coverage is available. The insurers' interpretation therefore not only contradicts the plain language of the policy, but also imposes a precondition to coverage found nowhere in the policy.

The dissent correctly points out that the stipulation in which Loral agreed to the fee award to BlackRock's counsel states that Loral was paying the fee "[i]n consideration of the results achieved by the derivative plaintiffs." However, this language does not change the reality that the fee award is an amount that Loral has become legally obligated to pay. Loral stood by its directors and officers. It never took over this lawsuit. Because it remained a nominal defendant, Loral now is legally obligated to pay the fee award. The policy covering Loral provided coverage for losses resulting solely from a "Securities Claim." Loral paid an extra premium to expand "Securities Claim" to include derivative lawsuits. A loss from a derivative suit is precisely what happened here. Accordingly, the plain terms of the policy dictate that the insurers must cover the fee award in the BlackRock action.

■ However, the claims in the Highland class action do not fall within coverage because they do not involve a "Securities

Claim." These claims are not derivative claims and did not otherwise allege a violation "of any federal, state, local regulation, statute or rule regulating securities." Rather, they allege only breach of fiduciary duty by the company's directors. Loral's argument that both Delaware actions were based on the "entire fairness rule," that governs securities transactions, is without merit. The entire fairness rule is not a rule regulating securities. It is a standard to review corporate transactions where, as here, the plaintiff has rebutted the presumption of fairness arising from the business judgment rule (*see Emerald Partners v Berlin*, 787 A2d 85, 91 [Del 2001]; *Weinberger v UOP, Inc.*, 457 A2d at 710). The clear language of the policy does not encompass losses arising from an action brought against the company and its directors claiming only common-law breach of fiduciary duty (*see generally P.J.P. Mech. Corp. v Commerce & Indus. Ins. Co.*, 65 AD3d 195 [2009]).

Accordingly the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered on or about February 16, 2010, that denied plaintiffs' motion for summary judgment on their cause of action seeking a declaration that they are not obligated to reimburse defendant for attorneys' fee awards in an underlying Delaware class action and derivative lawsuit, and granted defendant's cross motion for summary judgment declaring that plaintiffs are so obligated, should be modified, on the law, to grant plaintiffs' motion to the extent of declaring that plaintiffs are not obligated to indemnify defendant for the part of the fee award that directed defendant to pay fees to Abrams & Laster LLP as counsel for the class action plaintiffs, and to deny defendant's motion to the same extent, and otherwise affirmed, without costs.

CATTERSON, J. (dissenting in part and concurring in part). Because, in my opinion, defendant Loral Space did not sustain a "loss," I must respectfully dissent from that part of the majority opinion finding that plaintiff insurers are obligated to indemnify defendant for attorneys' fees in the underlying derivative action.

The following facts are not disputed: during the policy period, Loral entered into a transaction with a controlling shareholder, MHR Fund Management LLC (MHR), which resulted in the filing of two lawsuits in the Delaware Chancery Court. The lawsuit at issue in this dissent is the derivative action commenced by a group of shareholders led by BlackRock Corporate High Yield Fund, Inc. The group (hereinafter referred to as either the de-

rivative plaintiffs or plaintiff shareholders) sought rescission of the transaction which it alleged "operates as an unfair transfer of wealth to a controlling shareholder." This action and a class action by another shareholder, Highland Crusader Offshore Partners, L.P., seeking monetary damages were consolidated by the Delaware Chancery Court, and tried together.

After trial, the Chancery Court, applying the "entire fairness standard" of review, held that the transaction was unfair to Loral. It found essentially that MHR had underpaid for what it received. The court devised an equitable remedy that reformed the transaction by greatly reducing the nature and number of Loral securities that MHR had ostensibly purchased for $300 million. The court entered a final judgment "in favor of Loral and against MHR." (*In re Loral Space & Communications Inc.*, 2008 WL 4293781, *39, 2008 Del Ch LEXIS 136, *151 [2008].)

Thereafter, counsel for BlackRock and counsel for Highland applied for awards of attorneys' fees. Loral stipulated to an award of approximately $8.7 million for BlackRock's counsel in the derivative action. The language of the stipulation made it clear that Loral was paying the fee "[i]n consideration of the results achieved by the derivative plaintiffs in this action."

Loral could not reach a similar agreement with Highland, but using the lodestar method to calculate the fees the Chancery Court awarded Highland's counsel about $10.7 million for fees and expenses. The court found that the litigation had produced a substantial benefit to the company, thus warranting an award of fees under the corporate benefit doctrine; that award was affirmed on appeal. (*Loral Space & Communications, Inc. v Highland Crusader Offshore Partners, L.P.*, 977 A2d 867, 870 [Del 2009].)

Loral satisfied the final order in the Delaware action by paying the full amount of the attorneys' fees awards. Loral then sought to have the plaintiff insurers in the instant action reimburse the funds pursuant to their insurance policy. The plaintiff insurers notified Loral that the fee awards were not covered by the policy. Plaintiff insurers then filed this declaratory judgment action seeking a declaration that the fee award is not a covered loss under the policy. Cross motions for summary judgment followed.

Subsequently, the court granted Loral's motion for partial summary judgment, finding that the fees paid to the attorneys in the underlying litigation are covered by the subject insurance policy. For the reasons set forth below, I part company with the

majority in its affirmance of that part of the decision that declares the fee award in the derivative action is covered under the subject policy.

Under the Management Liability and Company Reimbursement policy issued by the plaintiff insurers to defendant Loral, the relevant provision states that plaintiff insurers will pay "on behalf of the Company[,] Loss resulting solely from any Securities Claim first made against the Company during the Policy Period . . . for a Company Wrongful Act."

The policy defines "[l]oss" as "damages, judgments, settlements or other amounts (including punitive or exemplary damages where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay." It defines "Securities Claim" as either a derivative claim brought by a shareholder, or a claim made against the Company "for a violation of any federal, state, local regulation, statute or rule regulating securities." It defines "Company Wrongful Act" as "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company in connection with a Securities Claim."

The majority characterizes the attorneys' fees award as a loss, finding that it falls within the category of "other amounts . . . that the Insured is legally obligated to pay." In my opinion, the policy definition of loss is not as broad as the majority perceives it to be. As a threshold matter, the subject matter of the adjectival clause "legally obligated to pay" is "the Retention," that is, the self-insured deductible portion of the defense expenses that Loral agreed to pay, and not "other amounts." Indeed, it is undisputed that the plaintiff insurers funded the defense costs and paid out approximately $9 million in excess of the $5 million that Loral paid as the retention portion of those expenses.

Second, "[l]oss" as defined in the provision is clearly meant to arise from payments in the form of *damages* whether awarded by judgment in cases of a proven wrongful act by the company, or negotiated in a settlement in the case of a wrongful act that has not been proved, but has been alleged. "[O]ther amounts" is characterized as including punitive or exemplary damages. In other words other types of *damages* that are insurable by law. In my opinion, plaintiff insurers correctly assert that the motion court erred because it ignored the linking phrases of the provision which require a covered loss to be "[damages] resulting *solely* from any [s]ecurities [c]laim first made against the

Company during the Policy Period . . . for a Company Wrongful Act." In this case, it is undisputed that the Delaware court did not award monetary damages against any party; it found no wrongdoing by Loral, but ordered the remedy against a third party (MHR), and the resulting restructure provided a benefit to Loral.

In that regard, I believe the motion court's error lies in further ignoring the well-established principle that a covered loss must be an actual loss, and not an expense or the cost of doing business. (*See Safeway Stores, Inc. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F3d 1282, 1286 n 8 [1995] ["(t)he plain meaning of the term 'loss' requires that (a company) suffer a financial detriment"].)* As the plaintiff insurers assert, the court cannot ignore the plain and ordinary meaning of the word "[l]oss." (*See Reliance Group Holdings v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 188 AD2d 47, 54-56 [1st Dept 1993], *lv dismissed in part, denied in part* 82 NY2d 704 [1993] [no loss because Reliance ended up with gain of $74 million even though it had to pay $21 million to settle claims against it].) The majority takes the position that this Court's decision in *Reliance* stands *merely* for the proposition that disgorgement of wrongfully acquired funds is not an insurable loss. However, I agree with plaintiff insurers that, while *Reliance* indeed reiterates that proposition, it is enunciated as part of the broader principle that there must be an *actual* loss. In other words, the purported loss must be viewed in the context of an entire transaction. In *Reliance,* this Court makes the tautological link concluding, "Reliance sustained no 'loss' as defined in the policy, but rather realized a profit of approximately $74 million." (188 AD2d at 55.)

Similarly, in this case Loral did not sustain a loss but rather benefitted from the judgment. The Delaware Chancery Court concluded that the "MHR Financing was unfair and that a final judgment should be entered in favor of Loral and against MHR." (2008 WL 4293781, *39, 2008 Del Ch LEXIS 136, *151.) The Delaware Chancery Court reformed the terms of the MHR financing. In return for its original $300 million investment,

---

* In my opinion, the majority's reliance on *Safeway* for holding that the attorneys' fees awards in this case are a covered "out-of-pocket loss" is misplaced as it is entirely distinguishable on the facts: *Safeway* was not a derivative suit, but a series of class action suits in which the company defended and indemnified its directors for breach of fiduciary duty. The attorneys' fees were a covered loss under its directors and officers liability policy. In any event, they were a negotiated part of the settlement. (*Safeway* at 1287.)

MHR was to receive nonvoting common stock instead of convertible preferred stock. In other words, the reformation eliminated the massive dilution of convertible stock and conversion rights, and all other terms of the transaction were voided. As the Chancery Court observed, "conversion rights, payment in kind, dividends and close voting all have financial value to a publicly traded corporation." It concluded that the reformation was "clearly a hugely substantial benefit [to Loral]."

The fact that the benefit is not *precisely* quantifiable because there was no monetary judgment awarded is irrelevant. It is well established that attorneys' fee awards in shareholder derivative suits are awarded either from a "common fund" where shareholder litigation results in a money judgment, or the fees are awarded pursuant to the "corporate benefit doctrine." (*See Fletcher v A.J. Indus. Inc.*, 266 Cal App 2d 313, 72 Cal Rptr 146 [1968].) Hence, the corporate benefit doctrine evidences the fact that some successful derivative litigation does not result in monetary gain but in intangible benefits to the corporation. (*See In re First Interstate Bancorp. Consol. Shareholder Litig.*, 756 A2d 353, 357 [Del Ch Ct 1999], *affd sub nom. First Interstate Bancorp v Williamson*, 755 A2d 388 [Del 2000] [corporate benefit doctrine comes into play when tangible monetary benefit is not conferred but some other valuable benefit is].)

The majority footnotes its acknowledgment of this, yet fails to draw the logical conclusion. Instead, while conceding that Loral may have received a benefit because "it no longer had to suffer harm," the majority nevertheless observes that "it does not follow that Loral actually made a tangible profit" and therefore Loral's "benefit is illusory." Loral's minority shareholders may beg to differ.

Indeed, Loral, in stipulating to the award of more than $8.7 million in attorneys' fees, agreed that it was "[i]n consideration of the results achieved by the derivative plaintiffs in this action." Moreover, while I do not address the issue of the attorneys' fees award in the class action suit because the majority finds that the award is not a loss as defined by the policy, the finding of the Chancery Court that it should be awarded pursuant to the corporate benefit doctrine is instructive. Further, the Delaware Supreme Court affirmed the award and the finding of the trial court that the attorneys had "conferred a benefit in excess of $100 million, plus a substantial therapeutic benefit." (977 A2d at 870.)

Finally, it should be noted that the rationale that supports the exception to the American rule in awarding attorneys' fees

in derivative litigation also explains why payment of such fees cannot be characterized as a loss according to any plain and ordinary meaning of the word. The rationale for such exception is that the expense of litigating what ultimately results in a benefit to the corporation should not rest entirely on the shoulders of a few plaintiff shareholders, but should be spread among all shareholders of the company for whose benefit the shareholder brought suit. (*See Mills v Electric Auto-Lite Co.*, 396 US 375, 392 [1970]; *see also Richman v DeVal Aerodynamics, Inc.*, 40 Del Ch 548, 550, 185 A2d 884, 885 [1962].) In the latter seminal case, the court found that attorneys' fees are to be awarded where benefits accrue to that class of shareholders of which derivative plaintiff is a member "such as to require, *in equity, payment by the class as a whole.*" (40 Del Ch at 552, 185 A2d at 886 [emphasis added].)

For this reason, the attorneys' fees award is essentially viewed as the equitable entitlement of the successful derivative plaintiff to recover the expense of his/her attorneys' fees from all the shareholders of the corporation on whose behalf the suit was brought. (*Mills*, 396 US at 392.) In that case, the United States Supreme Court recognized that "allow[ing] others to obtain full benefit from the plaintiff's [shareholder's] efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." (*Mills*, 396 US at 392.) Clearly, if *not* spreading the cost of attorneys' fees sounds in unjust enrichment, the obvious corollary is that shifting the cost to shareholders as a group cannot be characterized as a loss. (*See generally Reliance Group Holdings*, 188 AD2d at 54-56.)

TOM, J.P., and ANDRIAS, J., concur with MOSKOWITZ, J.; CATTERSON and ACOSTA, JJ., dissent in part and concur in part in a separate opinion by CATTERSON, J.

Order, Supreme Court, New York County, entered on or about February 16, 2010, modified, on the law, to grant plaintiffs' motion to the extent of declaring that plaintiffs are not obligated to indemnify defendant for the part of the fee award that directed defendant to pay fees to Abrams & Laster LLP as counsel for the class action plaintiffs, and to deny defendant's cross motion to the same extent, and otherwise affirmed, without costs.