IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE VERIZON INSURANCE<br>COVERAGE APPEALS</td><td>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§</td><td>No. 558, 2018<br>No. 560, 2018<br>No. 561, 2018<br><br>Court Below: Superior Court<br>of the State of Delaware<br><br>C.A. No. N14C-06-048 (CCLD)</td></tr>
</table>

Submitted: September 11, 2019
Decided: October 31, 2019

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

Upon appeal from the Superior Court. **REVERSED**.

Kurt M. Heyman, Esq. (*argued*), Aaron M. Nelson, Esq., HEYMAN, ENERIO, GATTUSO & HIRZEL LLP, Wilmington, Delaware; Scott B. Schreiber, Esq., James W. Thomas, Jr., Esq., William C. Perdue, Esq., ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C.; Robert Reeves Anderson, Esq., ARNOLD & PORTER KAYE SCHOLER LLP, Denver, Colorado; *Attorneys for Defendants-Appellants Illinois National Insurance Co. and National Union Fire Insurance Co. of Pittsburgh, PA.*

Bruce W. McCullough, Esq., BODELL BOVÉ, LLC, Wilmington, Delaware; Ronald P. Schiller, Esq. (*argued*), Daniel J. Layden, Esq., Jason A. Levine, Esq., HANGLEY, ARONCHICK, SEGAL, PUDLIN & SCHILLER, Philadelphia, Pennsylvania; *Attorneys for Defendant-Appellant/Cross-Appellee Zurich American Insurance Company.*

John C. Phillips, Jr., Esq., David A. Bilson, Esq., PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A., Wilmington, Delaware; Joseph A. Bailey III, Esq., CLYDE & CO US LLP, Washington, D.C.; A*ttorneys for Defendant-Appellant U.S. Specialty Insurance Company.*

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Robin L. Cohen, Esq. (*argued*), Keith

McKenna, Esq., Michelle R. Migdon, Esq., McKOOL SMITH P.C., New York, New York; *Attorneys for Plaintiffs Below-Appellees/Cross-Appellants Verizon Communications Inc., Verizon Financial Services LLC, and GTE Corporation.*

**SEITZ**, Justice:

This appeal turns on the definition of a Securities Claim in an insurance policy. Under the policy, a Securities Claim is a claim against an insured that "alleg[es] a violation of any federal, state, local or foreign regulation, rule or statute regulating securities . . . ." The Superior Court found the definition ambiguous. Using extrinsic evidence, the court held that fiduciary duty, unlawful dividend, and fraudulent transfer claims brought by a bankruptcy trustee against Verizon Communications Inc. and others are Securities Claims covered under the policy. We disagree, and find that, applying the plain meaning of the Securities Claim definition in the policy, the litigation trustee's complaint did not allege any violations of regulations, rules, or statutes regulating securities. Thus, we reverse the Superior Court's grant of summary judgment to Verizon and direct that summary judgment be entered for the Insurers.

I.

In 2006, Verizon divested its print and electronic directories business to its stockholders in a tax-free "spin-off" transaction. As part of the transaction, Verizon created Idearc, Inc. and appointed John W. Diercksen, a Verizon executive, to serve as Idearc's sole director. Idearc obtained Verizon's print and online directory business in exchange for about 146 million shares of Idearc stock, $7.1 billion in Idearc debt, and $2.5 billion in cash. Verizon then distributed Idearc common stock

to Verizon shareholders.  Idearc launched as a separate business with $9.1 billion in debt.

In connection with the Idearc spinoff, Verizon and Idearc purchased primary and excess Executive and Organizational Liability Policies ("Idearc Runoff Policies").[1]  Illinois National, an affiliate of AIG, issued the primary policy.  Zurich American Insurance Company and other carriers issued follow form excess policies, meaning that the excess policies incorporate the coverage provisions of the primary policy.  We refer to the primary and excess insurer parties as the "Insurers."[2]

The Idearc Runoff Policies covered certain claims made against the defined insureds during the six-year policy period that exceeded a $7.5 million retention.  Relevant to the dispute before us, Endorsement No. 7 to the policies states that "[i]n connection with any Securities Claim," and "for any Loss . . . incurred while a Securities Claim is jointly made and maintained against both the Organization and one or more Insured Person(s), this policy shall pay 100% of such Loss up to the Limit of Liability of the policy."[3]  "Securities Claim" is defined in pertinent part as a "Claim" against an "Insured Person" "[a]lleging a violation of any federal, state,

---

[1] Joint App. at 1270-1354.
[2] Additional carriers providing excess coverage are XL Specialty Insurance Company, Twin City Fire Insurance Co., RSUI Indemnity Company, U.S. Specialty Insurance Company, Westchester Fire Insurance Company, St. Paul Mercury Insurance Company, Arch Insurance Company, and ACE American Insurance Company.  *Id*. 1356-1491.
[3] *Id*. at 1318.

local or foreign regulation, rule or statute regulating securities (including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities)."[4] Under the policy, Verizon could recover its "Defense Costs" when a Securities Claim was brought against it and covered directors and officers, and Verizon indemnified those directors and officers.[5]

Idearc operated as an independent, publicly traded company until it filed for bankruptcy in 2009. During the reorganization, the bankruptcy court appointed U.S. Bank N.A. as trustee of a litigation trust to pursue claims against Verizon and others on behalf of creditors. In 2010, U.S. Bank filed suit in Texas federal court against Verizon, two related entities, and John Diercksen, the Idearc director at the time of the spin off. U.S. Bank as trustee sought $14 billion in damages allegedly caused by saddling Idearc with excessive debt at the time of the spin-off. Its complaint alleged violations of fraudulent transfer statutes; payment of unlawful dividends in violation of Delaware General Corporation Law; and common-law counts for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, promoter liability, unjust enrichment, and alter ego liability.[6]

---

[4] *Id*. at 1316.
[5] *Id*. at 1317-18.
[6] *Id*. at 1657-75.

After a bench trial, Verizon prevailed. The United States Court of Appeals for the Fifth Circuit affirmed the district court's decision.[7] During the nearly five years of litigation, Verizon and Diercksen incurred more than $48 million in defense costs. Verizon notified Illinois National of the *U.S. Bank* action and sought coverage for its joint defense costs under the Idearc Runoff Policies. In a June 21, 2011 letter, Illinois refused to cover Verizon's defense costs and claimed that "the U.S. Bank Complaint does not constitute a Securities Claim."[8]

In 2014, Verizon filed suit in the Superior Court of Delaware against Illinois National, National Union, U.S. Specialty, Zurich, and other excess insurers seeking coverage for its defense costs in the *U.S. Bank* action and related lawsuits. Verizon immediately moved for partial summary judgment and claimed that its defense costs should be covered because the *U.S. Bank* action qualified as a Securities Claim under the policy. The Superior Court denied Verizon's motion. According to the court, there was "sufficient ambiguity in the language of the policy such that prior communications and the dealings between the parties may become relevant."[9]

---

[7] *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 2013 WL 230329 (N.D. Tex. Jan. 22, 2013), *aff'd*, 761 F.3d 409 (5th Cir. 2014).

[8] Joint App. at 1715. In the letter, Illinois National agreed to reimburse Verizon for Diercksen's defense costs subject to indemnification, less the retention, because he was an Insured Person under the Idearc Runoff Policies. *Id.*

[9] *Verizon Commc'ns Inc. v. Ill. Nat'l Ins. Co.*, 2015 WL 1756423, at *3 (Super. Ct. Mar. 20, 2015).

Following discovery, the parties cross-moved for summary judgment on whether the *U.S. Bank* action fell within the policy's definition of a Securities Claim. The parties agreed that "no factual disputes exist for submission to the jury" and the outcome depended on the *U.S. Bank* action qualifying as a "Securities Claim."[10]

The Superior Court, after reviewing the evidence, found that Verizon's construction of "Securities Claim" was reasonable and the Insurers had failed to show that their interpretation was the only reasonable one.[11] Because each side had offered reasonable but conflicting interpretations for a "Securities Claim," the court deemed the definition ambiguous and looked to extrinsic evidence.[12] Resolving any uncertainty in Verizon's favor under the rule of *contra proferentum*, the court interpreted "any . . . regulation, rule or statute regulating securities" as "pertaining to laws one must follow when engaging in securities transactions."[13] The court found that "[t]he language in subsection (a) [of the Securities Claim definition] here is so broad it would simply be inappropriate to find that U.S. Bank's claims did not either allege, arise from, or were based upon or attributable to 'the purchase or sale

---

[10] Insurers' Opening Br. Ex. C at 13 (Decision and Order dated March 2, 2017). Illinois National Insurance Co., National Union Fire Insurance Co. of Pittsburgh, PA, and U.S. Specialty Insurance Company join in the Opening Brief arguing the Securities Claim issue. We refer to this opening brief as "Insurers' Opening Br." Zurich filed a separate opening brief on additional issues no longer relevant after this decision and incorporated Insurers' Opening Brief.
[11] *Verizon Commc'ns Inc. v. Ill. Nat'l Ins. Co.*, 2017 WL 1149118, at *11 (Del. Super. Ct. Mar. 2, 2017).
[12] *Id.*
[13] *Id.* at *12.

7

or offer or solicitation of an offer to purchase or sell any securities of an Organization.'"[14] Accordingly, the court granted Verizon's motion on summary judgment.[15]

## II.

## A.

To decide this appeal, we focus on the following arguments. The Insurers claim that the trustee in the *U.S. Bank* complaint did not raise a violation of any "regulation, rule or statute regulating securities" because the words "regulating securities" limits coverage to specific securities activities, as opposed to matters of general applicability. In other words, this Court should employ an ordinary interpretation of the word "regulate," which has been applied by courts in other closely related contexts to mean laws that regulate specifically the relevant subject matter, and not matters generally. As the Insurers argue, under the Superior Court's interpretation, "regulations, rules or statutes" would encompass a variety of non-security related claims.

The Insurers also argue that the Superior Court's contrary reading renders superfluous the "regulating securities" qualifier in the overall definition because of the already-stated separate requirement that a Securities Claim arise from a

---

[14] *Id*. at *13.
[15] *Id.* After the Superior Court granted summary judgment to Verizon, it entered a final judgment and awarded prejudgment interest. *Verizon Commc'ns Inc. v. Ill. Nat'l Ins. Co.*, 2018 WL 2317821 (Del. Super. Ct. May 16, 2018).

"purchase or sale" of securities or be brought by a security holder. Also, the Insurers claim that the common law duties raised in the complaint are not "regulations, rules or statutes" within the meaning of the policy. The "regulations, rules or statutes," according to the Insurers, are commonly understood to refer to federal and state securities law claims, like Rule 10b-5 claims,[16] Securities Act and regulatory violations,[17] and state Blue Sky laws.[18]

In response, Verizon argues that the plain language of the Securities Claim definition includes claims alleging a violation of "*any . . .* regulation, rule or statute regulating securities (including but not limited to, the purchase or sale . . . [of] securities." According to Verizon, the use of the word "any" shows the parties did not intend to exclude common law "rules" or claims that do not "specifically" or "principally" regulate securities. Further, as Verizon argues, because the Insurers chose the words "including but not limited to" when referring to securities law claims, "any . . . regulation, rule or statute regulating securities" should be construed broadly to include breach of fiduciary duty, unlawful dividend, and fraudulent transfer claims. Verizon also points to the drafting history of the policy, witness testimony purportedly contrary to the Insurers' plain meaning construction, and the Insurers' inconsistent coverage treatment of the same policy language.

---

[16] 17 C.F.R. § 240.10b-5.

[17] 15 U.S.C. § 77a-aa ("Securities Act of 1933"); 15 U.S.C. § 78a-qq ("Securities Exchange Act of 1934").

[18] *See* 6 *Del. C.* § 73 ("Delaware Securities Act").

9

At the outset of the litigation, Verizon and the Insurers took the position that the definition of a Securities Claim was unambiguous—Verizon by filing for summary judgment just weeks after filing its complaint, and the Insurers who agreed in their opposition to summary judgment.[19] That is no surprise, "as is often true in cases involving disputes over complex agreements" that "each of their views . . . are supported by the unambiguous terms of the [] Agreement."[20] A court need not, however, open the door to discovery simply because the parties disagree about the meaning of what they claim are unambiguous terms.[21] On appeal, we agree with the parties that the definition of a Securities Claim is unambiguous. We also conclude that the Insurers' reading of the definition is the proper one based on the plain meaning of the Securities Claim definition.

---

[19] *See* Joint App. at 380 (Verizon Opening Summary Judgment Br. at 20 ("This Court has thus correctly recognized that summary judgment on an insurer's defense obligations may be granted at the pleadings stage.")); *see also id.* at 382 (Insurers' Opposition Br. at 22 ("Both Delaware and New York law require enforcement of unambiguous contractual provisions as written.")). The Insurers did claim that factual disputes existed over allocation between Verizon and Diercksen, but did not argue there were factual disputes about the definition of Securities Claim. *See Id.* at 1806 (Insurers' Ans. Br. at 29 ("Summary judgment may not be granted when there are factual disputes over allocation.")). The parties have not made an issue of the choice of law below, and we will not on appeal.

[20] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926 (Del. 2017).

[21] *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

We review the interpretation of an insurance contract *de novo*.[22] Under the policy definition:

"Securities Claim" means a Claim made against any Insured Person:

(1)    Alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

    (a)    brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or

    (b)    brought by a security holder of an Organization with respect to such security holder's interest in securities of such Organization; or

(2)    brought derivatively on behalf of an Organization with respect to such security holder of such Organization, relating to a Securities Claim as defined in subparagraph (1) above.[23]

Looking at the definition as a whole[24] and applying the plain and ordinary meaning of the words used by the parties,[25] two things immediately stand out. First, the words used in the definition mirror those in a specific area of the law recognized as securities regulation. In the parlance of securities law statutes, securities laws

---

[22] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011).

[23] Joint App. at 1316-17.

[24] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

[25] *Rhone-Poulenc Basic Chemicals Co.*, 616 A.2d at 1195 (An insurance policy's clear and unambiguous language should be given its ordinary and usual meaning).

typically apply to "the purchase or sale, or offer for sale" of securities.[26]  Second,

securities laws typically involve not only statutes, but also rules and regulations.  For

example, under the federal Securities Act, the Commission has the authority to

make, amend, and rescind "rules and regulations" as necessary,[27] where "rules and

regulations" are defined together as "all rules and regulations adopted by the

Commission."[28]  An example of a "rule" created under the 1934 Act is Rule 10b-5,

which governs fraud "in connection with the purchase or sale of any security."[29]

And a typical securities regulation would be Regulation 13A, which contains several

rules governing certain reports.[30]  The language throughout securities statutes and

administrative rules regularly refers to "rules and regulations." [31]   Similarly,

Delaware Securities Law, i.e. a state Blue Sky law, allows the Investor Protection

---

[26] 15 U.S.C. § 77q (applying to the "offer or sale of any securities"); 15 U.S.C. § 78j (applying to certain conduct "in connection with the purchase or sale[] of any security other than a government security"); 17 C.F.R. § 240.10b-5 (applying to "the purchase or sale of any security"); 6 *Del. C.* § 73-201 (applying to fraud "in connection with the offer, sale or purchase of any security").

[27] 15 U.S.C. § 77s.

[28] 17 C.F.R. § 230.100.

[29] 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78j (providing authority for promulgating Rule 10b-5).

[30] 17 C.F.R. § 240.13.

[31] *See e.g.* 15 U.S.C. § 78j ("To effect a short sale . . . in contravention of such rules and regulations as the Commission may prescribe"); 15 U.S.C. § 7202(a) ("Commission shall promulgate such rules and regulations, . . . in furtherance of [the Sarbanes-Oxley Act]"); 12 U.S.C. § 5398 (providing authority to "prescribe such rules or regulations" under the Dodd-Frank Wall Street Reform and Consumer Protection Act); 17 C.F.R. Part 230 (Regulation A contains rules §§ 230.251-63); N.Y. Gen. Bus. Law, Art. 23-A §§ 352-e(1)(b) ("the attorney general may prescribe in rules and regulations"); Researching the Federal Securities Laws Through the SEC Website, SEC, https://www.sec.gov/reportspubs/investor-publications/investorpubssecuritieslawshtm.html (last visited Oct. 2, 2019) (explaining that "[a]n idiosyncrasy of the federal securities laws is that the term 'regulation' often refers to a collection of rules").

Director to "make, amend and rescind rules, [and] regulations,"[32] and defines a "Federal covered security" as "any security . . . [under] the Securities Act of 1933 . . . or rules or regulations promulgated thereunder."[33] Thus, we start with a basic understanding of the words used in the policy that the definition of a Securities Claim is aimed at a particular area of the law, securities law, and not of general application to other areas of the law.

Our basic understanding is also confirmed by the parties' use of the limiting phrase "regulating securities." When we use the plain meaning of the words of the policy, and do not stretch their meaning to create an ambiguity,[34] the regulations, rules, or statutes must be those that "regulate securities." As noted earlier, regulations, rules, or statutes that regulate securities are those specifically directed towards securities, such as the sale, or offer for sale, of securities. They would not be directed at the common law or statutory laws outside the securities regulation area.

Our basic understanding is confirmed by other courts that have addressed the same or similar issues. The New York Court of Appeals considered a similar insurance policy that defined "Securities Claim" as a claim "against any insured . . .

---

[32] 6 *Del. C.* § 73-102.
[33] *Id*. at § 73-103.
[34] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) (Absent ambiguity, the court should not destroy or twist policy language under the guise of construing it).

13

for a violation of any federal, state, local regulation, statute or rule regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities . . . ."[35] The Court of Appeals found that the common law "entire fairness rule is not a rule regulating securities" because "[i]t is a standard to review corporate transactions."[36] The court held that "[t]he clear language of the policy does not encompass losses arising from an action . . . claiming only common-law breach of fiduciary duty."[37]

The United States Court of Appeals for the Ninth Circuit has also affirmed a decision interpreting an insurance policy that defined a "Securities Claim" as a violation of "any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities)."[38] The court held that the policy did not cover a breach of contract claim that involved securities transactions or a conspiracy claim that included stock transactions because neither violated "any rule, statute, or regulation" regulating securities.[39]

---

[35] *XL Specialty Ins. Co. v. Loral Space & Commc'n, Inc.*, 82 A.D. 3d 108, 918 N.Y.S.2d 57, 69 (N.Y. App. Div. 2011).

[36] *Id*. at 64.

[37] *Id.*

[38] *Kollman v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2007 WL 2344825, at *3-4 (D. Or. Aug. 13, 2007), *aff'd*, 542 F. App'x 649 (9th Cir. 2013).

[39] *Kollman*, 542 F. App'x at 649 ("The complaint alleged breach of contract, breach of fiduciary duty, conspiracy, and similar claims, not violations of securities law. Vague references to potential securities violations are not enough.").

There are parallels in cases in other contexts. For example, in *Pilot Life Ins. Co. v. Dedeaux*,[40] the United States Supreme Court interpreted a similar phrase in an ERISA case. In general, ERISA preempts any state law that relates to employee benefit plans.[41] But, a savings clause exempts from preemption "any law of any State which regulates insurance, banking, or securities."[42] When interpreting the savings clause, the Court found that a "common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry."[43]

In *Pilot Life*, an employee brought several state common law claims against an insurer and argued that the tortious breach of contract claim fell under the savings clause.[44] The Court disagreed because "the roots of this law are firmly planted in the general principles of [] tort and contract law. Any breach of contract, and not merely breach of an insurance contract, may lead to liability . . . ."[45] Because the

---

[40] 481 U.S. 41 (1987).

[41] *Id.* at 45; 29 U.S.C. § 1144(a).

[42] 29 U.S.C. § 1144(b)(2)(A).

[43] *Dedeaux*, 481 U.S. at 50; *see also Michigan Carpenters Council Health and Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 383-84 (6th Cir. 1991) (finding that the Michigan Business Corporation Act does not "regulate securities" under ERISA because its express purposes were to govern corporations, even though its provisions "relate to" and "affect" securities, and because Michigan separately adopted the Michigan Uniform Securities Act).

[44] *Dedeaux*, 481 U.S. at 48.

[45] *Id.* at 50 ("The state common law of bad faith may be said to concern 'the policy relationship between the insurer and the insured.'").

tortious breach of contract claim was rooted in general contract law, and not specifically directed towards insurance, the savings clause did not apply.[46] Similarly here, the plain meaning of the qualifier "regulating securities" means any "regulation, rule or statute" specifically directed towards securities regulation.

Finally, our interpretation is confirmed by the fundamental rule of contract interpretation to "give effect to all terms of the instrument."[47] "Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'"[48] The definition of a Securities Claim separately requires the claim either arise from a "purchase or sale" of securities or be brought "by a security holder."[49] If a claim arises from a "purchase or sale" of securities, or is brought by a securities holder with respect to such interest, the claim necessarily pertains to a law one must follow when engaging in a securities transaction. Because the Securities Claim definition separately establishes a connection to a securities transaction, then regulations, rules, or statutes must be directed specifically towards securities laws for "regulating securities" to have meaning in the definition.

---

[46] *Id.*

[47] *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998); *see* Verizon's Opening Br. at 44; Insurers' Reply Br. at 5.

[48] *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (quoting S*onitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[49] Joint App. at 1316-17.

Having interpreted the policy language according to its plain meaning, we apply the definition to the claims brought by the trustee against Verizon. The trustee's complaint alleged fiduciary duty violations, unlawful dividends under Delaware law, statutory fraudulent transfer claims, and unjust enrichment and alter ego common law claims.[50] Because none of these claims implicates a "regulation, rule or statute" specifically directed towards securities law, none of the claims fall under the "Securities Claim" definition of the policy.

Taking the fiduciary duty allegations first, the trustee alleged breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, and promoter liability claims against Verizon and others.[51] These claims are not reasonably characterized as regulations, rules, or statutes. Instead, they involve a common law duty that if breached, leads to liability. Equally important, the trustee's fiduciary-based claims are not specific to regulations, rules, or statutes *regulating securities*. Instead, they include a variety of claims when "one person reposes special trust in another" or when "a special duty exists on the part of one person to protect the interests of another."[52] In other words, fiduciary duty claims do not depend on a

---

[50] *Id.* at 1657-75.

[51] Promoter liability stems from the "fiduciary relationship between the promoters of a corporation and the corporation itself." *Gladstone v. Bennett*, 153 A.2d 577, 582 (Del. 1959).

[52] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006).

security being involved. They encompass claims like director and officer compensation claims,[53] corporate opportunity claims,[54] or disputes between trustees and beneficiaries of a trust.[55] Thus, because the trustee's fiduciary duty-based claims do not involve regulations rules and statutes regulating securities, they do not fall within the definition of a Securities Claim under the policies.

Next, the trustee alleged the unlawful distribution of dividends under 8 *Del. C.* §§ 170, 173, 174, and claimed that "Idearc lacked a surplus or net profits under which the dividends could legitimately occur," and "Verizon received the dividends . . . in bad faith and with knowledge of facts indicating the dividends were unlawful."[56] These statutes authorize directors to issue dividends out of surplus or net profit,[57] permit dividends in the form of stock,[58] and provide for joint and several liability for directors who willfully or negligently issue dividends unlawfully.[59] Although they are statutes under the policy, the statutes here regulate dividends, not securities. While it is possible to issue securities as a dividend, the fact that stock

---

[53] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (dismissing a breach of fiduciary duty claim for excessive officer compensation); *Tornetta v. Musk*, 2019 WL 4566943 (Del. Ch. Sept. 20, 2019) (denying a motion to dismiss a breach of fiduciary duty claim for excessive officer compensation).

[54] *Guth v. Loft*, 5 A.2d 503 (Del. 1939).

[55] *McNeil v. McNeil*, 798 A.2d 503, 506 (Del. 2002).

[56] Joint App. at 1665.

[57] 8 *Del. C.* § 170.

[58] *Id*. at § 173.

[59] *Id*. at § 174.

might be involved is incidental to the regulatory purpose of the statute—to ensure that dividends are not issued to render a corporation insolvent.[60]  As a result, they are not statutes "regulating securities."

Turning to the trustee's fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act and the U.S. Bankruptcy Code, "TUFTA's purpose is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach."[61]  The relevant provisions of TUFTA set standards for fraudulent transfers and specify creditors' remedies.[62]  The Bankruptcy Code provisions "outline the circumstances under which a trustee may pursue avoidance."[63]  Neither of these statutes is specific to transfers involving securities.  Like the statutory unlawful dividend claims, these laws give rise to causes of action with or without the presence of securities.  Thus, these claims are not specific to securities regulation, and do not fall within the definition of a Securities Claim under the policy.

Finally, Verizon concedes on appeal that the trustee's last two claims for unjust enrichment and alter ego liability do not fall within the Securities Claim

---

[60] *See Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985) (finding that § 174 protects creditors); *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1226 (Del. Ch. 2019) (noting that Section 174 is "designed to protect creditors of a corporation from distributions of corporate funds viewed as inappropriate because they undermine the ability of the corporation to repay its debts").

[61] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016).

[62] *See* Tex. Bus. & Com. Code Ann. § 24.005-06, 08.

[63] *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018).

definition.[64]  "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[65]  The alter ego doctrine is used to pierce the corporate veil when a corporation has created "a sham entity designed to defraud investors and creditors."[66]

Like the trustee's fiduciary duty claims, unjust enrichment and alter ego claims are common law claims.[67]  As such, they are not "regulations, rules or statutes" under the policy.  Even if they were, they are not specifically directed towards securities.  Unjust enrichment is an equity-based claim,[68] and the alter ego doctrine is focused on fraud in corporate form.[69]  Their application does not depend on securities being present, and they are not otherwise specifically directed towards securities.  Thus, they are not a Securities Claim under the policy.

---

[64] Verizon's Opening Br. at 46-48.

[65] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citing *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[66] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

[67] *See Wolfson v. Artisans Sav. Bank*, 1985 WL 44686, at *4 (Del. Ch. Oct. 31, 1985) (considering "common law claims for unjust enrichment"); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. June 18, 1992) ("[A]n alter ego claim . . . is equitable in nature.").

[68] *See* Am. Jur. 2d Restitution and Implied Contracts § 3 ("Unjust enrichment is defined as the unjust retention of a benefit to the loss of another . . . against the fundamental principles of justice or equity") (quotations omitted).

[69] *See Crosse*, 836 A.2d at 497 ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors.").

D.

Verizon argues for an alternative plain meaning interpretation of a Securities Claim under the policy. First, Verizon contends that "rules" regulating securities should encompass "common law rules." It looks to the dictionary definition of "rule," which includes a "judicial order, decree, or direction; ruling."[70] From this, and the use of the "expansive word '*any*'" modifying "rule," Verizon concludes that the definition includes "all types of laws from the three branches of government."[71] It also argues that limiting "rules" to administrative or agency rules would render "rule" superfluous because "regulation" would then subsume the word "rule."[72] Finally, it points to the use of the words "law (common or statutory)" elsewhere in the policy, and claims that use of "law" elsewhere shows the parties intended "law" to include the common law, and by extension "rule" to include common law rules.[73]

These arguments are off the mark. The fourth alternative dictionary definition of "rule" advocated by Verizon—"judicial order, decree or direction"—is not dispositive when it is inconsistent with the definition when read as a whole.[74] It is also clear that Verizon's dictionary definition is more naturally aimed at court

---

[70] Verizon's Opening Br. at 42 (citing *Rule*, Black's Law Dictionary (10th ed. 2014)).

[71] *Id.* at 43.

[72] *Id.*

[73] *Id*. at 44.

[74] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (finding that multiple, conflicting dictionary definitions do not necessarily render a word ambiguous in the context of the contract language and circumstances).

21

"rulings," not rules themselves.[75] And, "rule" does not subsume "regulation" in the definition because the statutory language governing securities typically refers to the promulgation of "rules and regulations," which are not the same even though regulations may be made up of rules.[76]

Further, the modifier "any" does not indefinitely broaden the Securities Claim definition, but rather ensures that the definition includes all "regulations, rules or statutes regulating securities" of their kind. And finally, including "law (common or statutory)" elsewhere in the policy does not bear on what "rule" means here. The parenthetical from another part of the policy should not be incorporated into the Securities Claim definition absent some indication of an intent to do so. On the contrary, referring to the common law elsewhere in the policy demonstrates that the parties knew how to expressly provide for coverage of common law claims when that was intended.[77]

---

[75] Black's Law Dictionary (10th ed. 2014) ("4. A judicial order, decree, or direction; RULING (1).").

[76] *See e.g.* 17 C.F.R. Part 230 (Regulation A contains rules §§ 230.251-63 under the 1933 Securities Act).

[77] S*ee Russello v. U.S.*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, *7 (Del. Ch. Dec. 30, 2010) (interpreting an unambiguous provision, the court found that the "use of different language in the two sections shows the parties knew how" to provide coverage when intended, which made the absence of such language in the other provision suggest the same coverage was not present); *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999) (applying the interpretative maxim of *expression unius est exclusion alterius*—the expression of one thing is the exclusion of another—to find that a health insurance provision did not impliedly exclude

Next, Verizon argues that "regulating securities" should include any "laws one must follow when engaging in securities transactions."[78] It argues that the definition does not limit coverage to regulations, rules, or statutes that "principally" or "specifically" regulate securities because such an interpretation is inconsistent with the plain meaning of "regulate" and adds "un-bargained-for words [that] are entirely absent from the definition."[79] For support, it again looks to a dictionary definition of "regulate"—"to control (an activity or process) esp. through the implementation of rules."[80] Under its broad definition, Securities Claim covers the *U.S. Bank* claims because the relevant laws applied to a transaction involving securities.[81]

The problem with Verizon's "involving securities" interpretation is that it casts too broad a net. Its interpretation would encompass laws governing conduct

---

procedures in one section because the insurance contract expressly excluded procedures in another) (citing *Walt v. State*, 727 A.2d 836, 840 (Del. 1999)).

[78] *Verizon Commc'ns Inc.*, 2017 WL at *12.

[79] Verizon's Opening Br. at 45. Verizon also argues that limiting coverage to regulations, rules, or statutes that specifically regulate securities would exclude United States Supreme Court decisions relating to the application of securities laws because the Court also rules on other things. *Id.* at 48-49. We disagree because when determining whether an alleged violation of a securities law, as interpreted by the U.S. Supreme Court, is a Securities Claim, the issue is whether the underlying securities law "regulates securities," not whether the U.S. Supreme Court does.

[80] *Id.* at 46 (citing *Regulate*, Black's Law Dictionary (10th ed. 2014)).

[81] Verizon argues that Securities Claim covers fiduciary duty claims because they were allegations of market manipulation and overvaluing of debt securities to commit fraud on the market. *Id.* at 46-48. And, Verizon argues, it covers the DGCL and fraudulent conveyance claims because they were "intimately tied to the issuance or transfer of securities in connection with a securities transaction." *Id.*

unrelated to securities, but whose violation is unlawful even if committed in a securities transaction by an Insured Individual in their capacity as a director or officer.[82] And, as noted earlier, Verizon's interpretation of "regulating securities" is also duplicative of a separate requirement of a Securities Claim that the claim either arise from a "purchase or sale" of securities or be brought "by a security holder."[83] This separate condition requires a Securities Claim to pertain to laws one must follow when engaging in a securities transaction. Thus, interpreting "regulating securities" to impose the same limitation—laws one must follow when engaging in a securities transaction—would render "regulating securities" meaningless.[84]

Finally, Verizon argues that the parenthetical "(including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities)" after "regulating securities" does not restrict the meaning of "regulating securities"

---

[82] *See* Insurers' Reply Br. at 7-8 (including laws governing identity theft and theft of securities).

[83] Joint App. at 1316-17; Insurers' Reply Br. at 5-6.

[84] Parties involved in a securities-related transaction must follow laws not specifically directed toward securities. Verizon's interpretation would make any unlawful conduct committed during a securities-related transaction fall within the Securities Claim definition. Verizon argues its expansive interpretation of a Securities Claim is not overly broad because the policy is limited by its "narrow purpose of insuring against litigation risks arising from the Idearc spin-off" and its requirement that a Securities Claim be brought against "an Insured Individual *in his or her capacity as a public company director or officer*." Verizon's Opening Br. at 50-51. But, the policy's narrow purpose is no limitation at all here because the spin-off is an example of a securities-related transaction. And, the requirement for the claim to be against a director or officer in that capacity is broader than our determination of the plain meaning of the Securities Claim definition because such directors and officers are subject to laws beyond those specifically directed towards securities regulation.

to laws specific to securities transactions because it is expressly "not limited."[85]  This interpretation, however, renders the "purchase or sale" of securities clause meaningless because it would not be limited to those circumstances.  If we give the parenthetical meaning within the context of the overall definition, the "purchase or sale" clause provides only a non-exhaustive example of the type of "regulation, rule or statute regulating securities" that the definition sought to cover.[86]  Including a single example does not mean the definition is no longer tethered to laws regulating securities.  Because we agree with the Insurers' plain meaning interpretation of a Securities Claim, we find the definition of a Securities Claim unambiguous.[87]

## III.

The *U.S. Bank* litigation does not involve a Securities Claim as defined by the Idearc Runoff Policies.  Thus, Verizon is not entitled to recover its defense costs from the Insurers.  The judgment of the Superior Court is reversed, and the case is remanded to the Superior Court to enter judgment for the defendants.  The cross-appeal is dismissed as moot.  Jurisdiction is not retained.

---

[85] *Id.* at 49.

[86] *See also Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 ("The well-established rule of construction, *ejusdem generis*, is that "'where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.'").

[87] Verizon's remaining arguments rely on extrinsic evidence.  Because we find that the Securities Claim definition is unambiguous, we need not resolve these arguments.  *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract.").